## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

**GREGG MERRILEES,**          )
                             )
　　　　**Petitioner,**          )
                             )
**v.**                        )          **Case No. 3:24-cv-1095**
                             )          **Judge Trauger/Frensley**
**BRETT COBBLE, WARDEN,**      )
                             )
　　　　**Respondent.**          )

## REPORT AND RECOMMENDATION

In 2018, a jury in Rutherford County, Tennessee convicted Gregg Merrilees ("Petitioner")

of aggravated robbery and robbery in concert with two or more persons, and acquitted the

Petitioner of especially aggravated kidnapping. *Merrilees v. State*, No. M2021-01324-CCA-R3-

PC, 2023 WL 3309562, at *1, 5 (Tenn. Crim. App. May 8, 2023), *appeal denied* (Nov. 16, 2023)

Petitioner was sentenced to sixteen years of imprisonment. *Id.* at *1. Following Petitioner's

conviction, the state courts denied Petitioner's requests for a new trial and denied Petitioner's

requests for relief from his conviction on direct appeal and in post-conviction proceedings. *Id.* at

*5-6. Having sought relief in the state courts, Petitioner has filed a petition for a writ of habeas

corpus under 28 § U.S.C. 2254 and is alleging three claims. Docket No. 1, pp. 3-4. Petitioner's

first claim (Count I) is that there was insufficient evidence for a conviction due to the State's failure

to corroborate the accusations of an alleged accomplice. *Id.* at pp. 3. Petitioner's second claim

(Count II) is that he received ineffective assistance of counsel based on the following four grounds:

(1) trial counsel's failure to raise and/or appeal the problem of insufficient evidence, (2) trial

counsel's failure to request a jury instruction on the requirement of accomplice corroboration, (3)

trial counsel's failure to object to the victim's speculation, based on his "gut", that Petitioner was

involved in the crime, and (4) trial counsel's failure to object to an in-court show-up identification of the Petitioner by the victim. *Id.* Petitioner's third claim (Count III) is that his in-court show-up identification was unreliable and suggestive, thus violating due process. *Id.* at pp. 4. The Warden ("Respondent") of the prison Petitioner is incarcerated in opposes Petitioner's request for habeas corpus relief. Docket No. 13, pp. 1.

For the reasons set forth below, the undersigned recommends that habeas corpus relief be DENIED.

## I.    BACKGROUND

The Tennessee Court of Criminal Appeals summarized the factual background of the case as follows:

> Dashaun Hickerson, an admitted drug addict who was in custody at the time of trial, testified that he moved to Tennessee in 2005, after Hurricane Katrina struck New Orleans, which earned him the nickname of N.O. He had been in different substance abuse programs to help with his drug problem and blamed his drug problem for why he was involved with the instant offenses. He knew the Petitioner, who Hickerson called "Peanut," and another individual named "Monk," but he did not know Monk's real name. Hickerson had only met Monk "maybe twice." Hickerson and the Petitioner were mutual friends and had the same drug addiction. Hickerson would contact the Petitioner on a weekly basis, and he considered their relationship to be "pretty close." On January 3, 2017, Hickerson met the Petitioner in Smyrna in the evening, after he got off work. Hickerson said he got in the Petitioner's car, and Katie, the Petitioner's ex-girlfriend, was also in the car.
>
> They drove to the Home Depot, retrieved some items, and the Petitioner left him at the Home Depot. Hickerson waited at the Home Depot until it closed and then walked down the street to a gas station. Around 1:00 a.m., when Hickerson was about to leave the gas station, the Petitioner pulled into the gas station. Though angry, Hickerson got in the car with the Petitioner. Only the Petitioner, Hickerson, and Monk were in the car at this time. Hickerson did not know where they were going, but they eventually pulled into the parking lot of a hotel because the Petitioner had to use the restroom. Hickerson did not remember the name of the hotel, but he thought it may have been the Hilton. Hickerson testified that the Petitioner was inside the hotel for twenty minutes while he and Monk stayed in the car. While inside the car, Monk's girlfriend repeatedly called him because she was "dope sick," and Monk became agitated.

When the Petitioner returned to the car, he told them that only one person was in the hotel. Hickerson understood what the Petitioner and Monk were about to do. The Petitioner then told Hickerson that he was going to have to go inside the hotel with Monk. The Petitioner drove to the front of the hotel, gave Hickerson a roll of duct tape, and told him to use it if necessary. Hickerson put the duct tape in his pants and went into the hotel with Monk. Monk asked the cost of a room while Hickerson acted like he was on the phone. As the hotel clerk was looking at the computer, Monk approached him armed with a knife and demanded money. The hotel clerk appeared scared and gave Monk the money. Monk then brought the hotel clerk to "the back" behind the counter and asked where the hotel safe was located. Hickerson followed them. Once behind the counter, the hotel clerk told them that he could not open the safe. At this point, Hickerson told the clerk to sit down, calm down, and that no one was going to hurt him. Hickerson then put tape around the hotel clerk's hands, took the hotel clerk's phone, and left.

When Hickerson went outside the hotel, the Petitioner was in the front of the hotel getting the cash register. Monk was heading toward the front door. The Petitioner put the cash register in the trunk of his car. Hickerson explained that the cash register the Petitioner put in the trunk was from the front of the hotel and not the same cash register the hotel clerk used to give Monk money. All three men got in the car, with the Petitioner driving, Monk in the front passenger seat, and Hickerson in the back seat. They then went to Nashville, picked up Katie, and bought and used drugs. They went to a house, where they used the drugs, and the Petitioner eventually dropped Hickerson at his home in Antioch.

Hickerson agreed that he was later arrested for the instant offenses and provided a statement to Detective Jason Anderson. He agreed that the information provided in the statement was not entirely consistent with his trial testimony. Upon being shown photographs, Hickerson initially denied it was him in the photograph, and he also denied that he tied up the hotel clerk-victim. He was untruthful as to how he came to meet the Petitioner on the day of the offenses and the events following the offenses, stating that he went straight home. Hickerson nevertheless insisted he was truthful and consistent regarding the persons who committed the robbery with him, the Petitioner and Monk. Hickerson had also previously reviewed the surveillance videos of the instant offenses and confirmed they portrayed the events on the night of the offenses as he testified to at trial.

The surveillance videos were admitted as evidence and played for the jury at trial. The first video shows a view of the front desk and two individuals: one individual is seen walking past the front desk into the darker area of the hotel and another masked individual is seen later taking something from behind the desk. No faces are shown on the video. Hickerson had met with the State prior to his testimony, but he was not made any offers or promises of leniency. During their discussions, Hickerson was advised to tell the truth. Hickerson identified the Petitioner in court as the person who accompanied him on the night of the offenses.

On cross-examination, Hickerson agreed that he was a heroin addict at the time of the offenses, but he denied that it affected his ability to remember at that time. Hickerson explained that he was "sick" or had not had any drugs. He confirmed that the Petitioner went inside the hotel for twenty minutes, and that he waited about five minutes before he and Monk entered the hotel. Hickerson confirmed that the Petitioner was outside of the hotel when he and Monk went inside. Hickerson also confirmed that Monk held the knife to the hotel clerk-victim, that Hickerson tied him up, and that the Petitioner was not present at either time. Hickerson agreed that he originally did not tell the police that the Petitioner provided him with duct tape. Hickerson also agreed that while he did not have an agreement with the State, he hoped the State would take his testimony into consideration for a better offer.

Decari Cradle, the hotel clerk-victim in this case, testified that in January 2017, he was employed at the Hilton Garden Inn. At the time of the offenses, his duties were as a night auditor, and no one else worked in the same area of the hotel. As part of his job, he had access to surveillance videos and a monitor at his desk, and he identified several photographs of the same as evidence at trial. On January 2, 2017, the victim's shift began at 11:00 in the evening, but he arrived fifteen to thirty minutes late. He said the only other employees present were the front desk manager and the bartender. The victim explained these employees would typically leave after updating him on the happenings at the hotel. The victim said an individual came into the hotel that night asking to use the bathroom who "seemed a little bit strange. Not too strange. Just to give a red flag." The bartender told the bathroom-goer where the bathroom was located. The bathroom-goer wore "like a red or burgundy shirt, had a hat, kind of like a fedora on." Asked if he saw the person who asked to go to the bathroom that night in the courtroom, the victim identified the Petitioner.

The victim did not see the Petitioner "physically" leave the hotel, and the victim only assumed the Petitioner left based on a car that came there "kind of when he was there." When the car left, the victim believed the Petitioner had left as well. The other two employees left after they thought the Petitioner had left, which was fifteen or twenty minutes later. Sometime later, two other individuals entered the hotel lobby together. The victim described one of the men as an "older male" with "kind of a jagged look." The other man "looked like a mixed guy" and was "heavy set." While one of the men inquired about the rates, the other man was on the phone. As the victim explained the rates, the men robbed him.

The victim said one of the men was armed with a knife and told him to "give me the damn money, I want the money." The victim complied, asking the men not to touch him. The other man had a bulge in the front of his pants, and the victim thought it may have been a gun, which made him "just really scared." After taking between $400 and $600 from the register, the men then took the victim to the front office which is where the office of the general manager, sales accounts, and safe were located. They asked the victim for the safe combination, which the victim did not know. The victim described, from photographs admitted into evidence, where the

men were positioned. The men then took the victim to another area in the hotel, sat him down, tied his hands, and took the phone cord from the front office. The victim confirmed that the "mixed" man told him to "just be compliant" and that they were not going to hurt him. When the men left, the victim was in shock and sat there for a minute to ensure the men were gone. He then went to another area in the hotel, cut himself free, and called his mother and the police to report the crime.

Once the police arrived, the victim noticed the cash register near the bar was gone and the monitor was broken. He identified photographs admitted as evidence of the drawer from which the perpetrators took the money during the robbery and the area where he was placed with his hands tied up. Following the offenses, the victim reviewed additional surveillance videos and observed the time was an hour ahead, meaning where it showed 1:27 it meant 12:27. The surveillance footage otherwise depicted the events as they unfolded on the night of the offenses. Based on the photographs, the victim confirmed the area surrounding the bar was "pretty dark." He also confirmed that he did not see the Petitioner during the actual robbery.

Asked if he mentioned the Petitioner to the police following the robbery, the victim replied, "I did off the top. I mean, he was the lookout. He was the lookout. And I knew it. It was my gut telling me. I knew certainly." The victim also confirmed it was possible for someone to walk in and go to the bathroom without being seen on the surveillance video; however, the victim could see the individual from where the victim sat. The victim said the value of his stolen cell phone was between $500 and $800.

On cross-examination, the victim agreed that the Petitioner did not enter the hotel with the other two men on the night of the offenses. The victim repeated that the Petitioner came into the hotel before the two other men and asked to use the bathroom. He confirmed that he told the police that a man came in to use the bathroom before the robbery. When the man asked to go to the bathroom, the victim responded as follows:

> we all got a good look at him – well, me and [the bartender] more than likely. . .[S]he kind of pointed to him. But I kind of looked, too, to get a good picture of him, because, you know, why is an outsider coming in around this time to use the bathroom. You know, it kind of gave me a little suspicion.

He agreed that when the bathroom-goer came into the bar area it was around 12:30 at night, and the bar was closed. He agreed that, based on the surveillance video, while the cash register was being taken from the bar area, the victim was tied up in the back area of the hotel. While the victim agreed that he told the police on the night of the offenses that the bathroom-goer had a tattoo under one of his eyes, the victim insisted that he told the police the bathroom-goer had tattoos "all over his face. Some of them was a little distinctive at that time. But his hat, his fedora hat was covering up . . ." When pressed about the difference between a single tattoo

under one eye and tattoos all over the bathroom-goer's face, the victim insisted he told the police they were all over his face but said that he "was really in shock" at the time he gave the statement.

The victim agreed that he was shown a photo lineup on January 27, 2017, which included the Petitioner. The victim was unable to identify the Petitioner as the bathroom- goer at that time. The victim explained that the photograph of the Petitioner within the photo lineup did not contain any tattoos. On re-direct examination, the victim further explained that as the Petitioner sat in court, he had multiple facial tattoos, which was "completely different than the photo lineup."

Henry Piarrot testified that he was the General Manager of the Hilton Garden Inn in Smyrna, Tennessee, at the time of the offenses. He received a call in the early morning hours of January 3, 2017, regarding a robbery. Upon arrival, Piarrot observed several items missing including the cash register drawer in the restaurant. He said that unit, valued at $250-$300, was destroyed, and the cash box was gone. There was approximately $500 missing from the other part of the hotel.

Detective Jason Anderson testified that he was employed in the Investigative Division of the Smyrna Police Department. He was on duty on the night of the offenses and responded to the Hilton Garden Inn. Upon arrival, he interviewed the victim, oversaw crime scene processing, and helped with photographs and collecting evidence. Detective Anderson specifically recovered a piece of duct tape, admitted as evidence, which was subsequently forwarded to the Tennessee Bureau of Investigation for testing, but it yielded no usable results.

Detective Anderson identified the Petitioner as a suspect in the instant investigation and developed a photo lineup containing the Petitioner's photograph. Detective Anderson agreed that the victim was unable to identify the Petitioner as the bathroom-goer from the photo lineup. The photo lineup was admitted into evidence. Detective Anderson said he experienced "difficulties" or "special circumstances" in developing this photo lineup. He explained the process of developing a photo lineup usually involved collecting a series of six photos, one of the suspect and five of other individuals who were similar in appearance, and then providing the lineup to a victim for possible identification. Detective Anderson wanted to make the lineup process in this case "as fair . . . as possible[,]" and "although it's getting more popular to have tattoos on [the] face, at that time [it] was even less popular." To be fair to the Petitioner, Detective Anderson included a driver's license photo of the Petitioner from 2013 with no tattoos on his face, along with other individuals similar in appearance. He agreed the victim was unable to identify the Petitioner from this photo lineup.

Detective Anderson also interviewed Hickerson, who had been previously developed as a suspect based on his image in the surveillance video and other interviews. At the time Detective Anderson interviewed Hickerson, he had already developed the Petitioner as a suspect. Prior to the interview with Hickerson,

Detective Anderson did not tell Hickerson of the other potential suspects in the case. Detective Anderson explained that in his years of experience as a detective, he expected possible suspects to initially minimize their involvement in an offense. Detective Anderson also requested and received surveillance video footage from the hotel from the night of the offenses. Based on his recollection of the footage, there were no other people around the hotel at the time of the offenses. The surveillance video from the bar was also admitted into evidence.

On cross-examination, Detective Anderson identified the two men on "the main video" who entered the hotel on the night of the offenses armed with a knife as Hickerson and Robin Phillips, the other co-defendant. Detective Anderson also agreed that he reviewed over 100 different surveillance video clips of the hotel from the night of the offenses and that the Petitioner was not shown in any of those clips as participating in the offenses. He clarified that the investigation revealed that the Petitioner entered the hotel approximately thirty minutes before the robbery occurred. He further agreed that there was a video of "a figure" walking from the bathroom area and out the door, but he could not confirm that it was the Petitioner. Detective Anderson also confirmed that he spoke with the victim for "quite a while" on the night of the offenses. He said the victim told him the bathroom-goer had "at least one tattoo" under his eye. However, he also agreed that his report "definitely [did] not say that [the bathroom goer]" had tattoos "all over his face." The report noted that "it's just one tattoo under one of the eyes," and that it was "possibly a cross[.]"

*Merrilees v. State*, 2023 WL 3309562, at *1-5.

## II.     PROCEDURAL HISTORY

The procedural history is summarized by the Tennessee Court of Criminal Appeals as

follows:

At the close of the State's proof, defense counsel moved for judgment of acquittal, which was denied by the trial court. In support, defense counsel briefly argued that the evidence was "insufficient" because "the only thing that places [the Petitioner] there . . . is the co-defendant's testimony. He's certainly got reason to lie and save himself." Defense counsel additionally argued that although the victim identified the Petitioner in court at trial, the victim was unable to do so on the night of the offenses or in the photo lineup. Finally, defense counsel argued that while there was clearly video of the other two co- defendants, there was no video, DNA, or fingerprint evidence linking the Petitioner to the offenses. The Petitioner did not offer any evidence at trial. Based upon the above proof, the jury convicted the Petitioner of aggravated robbery and robbery in concert with two or more persons and acquitted the Petitioner of especially aggravated kidnapping. The Petitioner received an effective sentence of sixteen years' imprisonment.

7

The Petitioner subsequently filed a motion for new trial, arguing that the trial court erred in ruling that should the Petitioner testify his prior conviction for aggravated robbery would be admissible to impeach the Petitioner; the trial court erred in allowing the State to amend the indictment approximately ten days prior to trial; the trial court erred in denying the Petitioner's newly retained attorney's motion to continue, the State mischaracterized evidence in closing argument; and based on the cumulative effect of errors, the Petitioner was entitled to a new trial. An amended motion for new trial was later filed to include that the trial court erred in giving preliminary jury instructions prior to the jury panel being sworn. On May 23, 2019, the trial court conducted a hearing on the motion for new trial, which was later denied by order on June 6, 2019.

The Petitioner appealed his convictions, which were affirmed by this court. State v. Gregg Merrilees, No. M2019-01194-CCA-R3-CD, 2020 WL 755054, at *5-6 (Tenn. Crim. App. Feb. 14, 2020), perm. app. denied (Tenn. June 3, 2020). The issues presented on direct appeal included whether the trial court erred by amending the indictment without also granting the Petitioner a continuance, by denying the Petitioner's motion to continue so he could employ private counsel, by issuing preliminary jury instructions prior to the jury panel being sworn, and by determining that there was no cumulative error. The Petitioner then filed a pro se petition for post-conviction relief on September 17, 2020, and on November 24, 2020, the Petitioner filed an amended petition for post-conviction relief. On October 21, 2020, post-conviction counsel was appointed to represent the Petitioner, and on May 20, 2021, post-conviction counsel filed an amended petition preserving the following issues: a stand-alone claim challenging the sufficiency of the evidence based on insufficient accomplice corroboration and ineffective assistance of trial counsel based on (1) failure to object "to the accusation based on the victim's 'gut'"; (2) failure "to object to or move for a new trial, or appeal the unconstitutional show-up"; (3) failure "to request a jury instruction about the corroboration of accomplices, or to move for a new trial, or appeal the deficient instructions on this issue"; and (4) failure "to move for acquittal, or appeal, the insufficiency of the evidence in light of the uncorroborated accomplice accusation."[1] On August 11, 2021, the State filed an answer to the petition denying all claims. On September 15, 2021, the State filed an amended answer detailing their position.

The post-conviction evidentiary hearing was held on September 21, 2021, and trial counsel was the sole witness. Trial counsel testified that prior to trial he was aware that the victim was unable to identify the Petitioner. Trial counsel confirmed that the hotel clerk "had mentioned" that the man that had gone into the bathroom on the night of the offenses had a tattoo on his face. Trial counsel agreed that the Petitioner had "multiple" tattoos on his face. Trial counsel said he argued the

---

[1] There were other issues in his petition for post-conviction relief which are not included in this appeal. Accordingly, we deem them to be waived. We have also re-ordered the Petitioner's issues for clarity. (Footnote from Tennessee Court of Criminal Appeals).

discrepancy at trial during cross- examination and in closing arguments. Trial counsel testified that he raised the issue that the victim had been unable to identify the bathroom-goer prior to trial. Trial counsel did not have a "plan" for when the State asked the hotel clerk to identify the person he saw go into the bathroom on the night of the offenses at trial. Trial counsel was generally aware of the law concerning "show-up" identifications, but he did not associate it with in-court identifications. Trial counsel did not believe the in-court identification of the Petitioner was a legal basis for the Petitioner's conviction to be overturned, and he did not include it as an issue in the motion for new trial. Trial counsel recalled the testimony from the victim concerning his "gut" feeling that the bathroom-goer was involved in the offenses. Trial counsel did not object to that testimony because, initially, there was no ground upon which to object, and "then by the time that was testified to, it had already come out." Trial counsel explained that he did not object after the testimony for strategic reasons, or because he did not want to highlight the issue more than it already was with a curative instruction.

Trial counsel was aware that the accomplice was going to testify at the Petitioner's trial, and he acknowledged that he did not have a specific plan regarding the need for the jury to be instructed on accomplice corroboration. Asked if he had a plan for why the issue was not included in the motion for new trial, trial counsel explained that he thought it was sufficiently corroborated based on the co-defendant's testimony, the testimony of the victim, and the surveillance videos. Trial counsel agreed that he moved for a judgment of acquittal, as was his normal practice. He could not recall why he did not "press" the corroboration argument at that stage of the trial.

Trial counsel also served as appellate counsel for the Petitioner. Trial counsel did not raise sufficiency of the evidence on direct appeal because he did not believe it was a "winnable argument[.]" While trial counsel was certain he considered raising the issue of the lack of accomplice corroboration, he could not recall why he chose not to include it as an issue on appeal. The appellate brief, filed by trial counsel in the direct appeal, was exhibited to the hearing. Trial counsel acknowledged that he did not file a reply brief, and he did not request oral argument.

On cross-examination, trial counsel agreed that his theory of defense was to discredit the co-defendant or to show that the co-defendant had an interest in the outcome of the trial by gaining some leniency from the State. Trial counsel also noted that he focused on the "misidentification" by the victim. Trial counsel believed his strongest argument was to challenge the identification and not accomplice corroboration. Trial counsel asserted, even if everything the State had put forth at trial were true, he emphasized the fact that the Petitioner was not involved "in the actual tying up of the victim" at trial. Based on this strategy, trial counsel obtained an acquittal on the most serious charge of especially aggravated kidnapping. He also agreed that the Petitioner received a sentence less than what was offered in plea negotiations by the State.

> By order on October 13, 2021, the trial court determined that the Petitioner failed to establish by clear and convincing evidence that he received ineffective assistance of counsel. The Petitioner filed a timely notice of appeal, and this case is now properly before this court for review.

*Merrilees v. State*, 2023 WL 3309562, at *5-6.

Petitioner's appeal of his denial of post-conviction relief to the Court of Criminal Appeals was affirmed by order on May 8, 2023. *Id.* at *1. The Court determined that Petitioner was procedurally barred from raising the legal sufficiency claim based on lack of accomplice corroboration since he did not challenge it on direct appeal, and that petitioner was not able to establish for each of his ineffective assistance of counsel claims both that his lawyer's performance was deficient and that the deficient performance prejudiced the defense. *Id.* at *8-15. Petitioner's subsequent appeal to the Tennessee Supreme Court was denied review without comment on November 16, 2023. *Merrilees v. State*, No. M2021-01324-SC-R11-PC, (Tenn. Nov. 16, 2023).

Petitioner initiated this action on Sept. 10, 2024 by filing a petition for writ of habeas corpus under 28 § U.S.C. 2254. Docket No. 1. The petition raises the following grounds for relief:

(1) Count I is a claim of insufficient evidence, alleging that there was insufficient evidence for a conviction due to the State's failure to corroborate the accusations of an alleged accomplice.

(2) Count II is a claim of ineffective assistance, alleging that trial counsel provided ineffective assistance by doing one of more of the following:

    a. Failing to raise and/or appeal the problem of insufficient evidence;

    b. Failing to request a jury instruction on the requirement of accomplice corroboration;

    c. Failing to object to the victim's speculation, based on his "gut", that Petitioner was involved in the crime; and

d. Failing to object to an in-court show-up identification of the Petitioner by the victim.

(3) Count III is a claim of due process violation based on an unreliable and suggestive in-court identification.

*Id.* at pp. 3-4.

Petitioner argues that while Counts I and III are waived and procedurally defaulted because trial counsel failed to raise these issues on direct appeal, Petitioner has good cause to excuse the default, and would be prejudiced if this Court refused to hear his claims on the merits, because trial counsel gave ineffective assistance by waiving these claims. *Id.* Petitioner states that Count II is preserved because Tennessee courts permit the filing of ineffective assistance claims on postconviction, which petitioner did. *Id.* at 3.

Respondent filed the state-court record on May 23, 2025 (Docket No. 11), and answered the petitioner on May 26, 2025 (Docket No. 13). Respondent argues that Petitioner is not entitled to relief and his petition should be dismissed because Petitioner failed to show that the Tennessee Court of Criminal Appeals' decision was contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts in light of the evidence presented. Docket No. 13, pp. 20. Furthermore, Respondent argues that Petitioner's insufficiency of evidence claim and Petitioner's unreliable and suggestive court identification claim are both procedurally defaulted because they were not raised on direct appeal, and these claims cannot be excused through attorney error as cause and prejudice because the state court rightly rejected the ineffective assistance of counsel claim. *Id.* at 32, 49-50. Thus, Respondent urges that Petitioner cannot rely on ineffectiveness to excuse default or succeed on the claims of ineffective assistance of counsel asserted in Count II. *Id.* at 32, 41-50. Finally, the respondent

asserts that even if this Court were to proceed to the merits of petitioner's claims, they all lack merit. *Id.* at 40-50.

Petitioner filed his reply on June 17, 2025, in which he maintains he is entitled to relief on each of his claims. Docket No. 15.

## III.    LEGAL STANDARD

### A.    Standard for Granting Application for a Writ of Habeas Corpus

Per 28 U.S.C. § 2254, a state prisoner may petition a federal court for relief from a state court conviction through a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner's claims are governed by 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which states that

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

Section 2254(d) indicates that federal habeas corpus review is limited to claims that were presented to a state court and adjudicated on the merits. Therefore, as long as a petitioner's claims are fully exhausted, or there is some other permissible excuse for a procedural default, the two possible grounds for habeas corpus relief provided in section 2254(d) can be granted to a state prisoner petitioning a federal court. *See id.* Regarding the first avenue for relief, a "state court decision is contrary to clearly established federal law if 'the state court applies a rule that

contradicts the governing law set forth in [the Supreme Court's] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at' a different result." *Davis v. Jenkins*, 115 F.4th 545, 553 (6th Cir. 2024) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)), *reconsideration denied*, No. 21-3404, 2024 WL 4661855 (6th Cir. Oct. 15, 2024), and *cert. denied sub nom. Davis v. Cool*, 145 S. Ct. 2756 (2025). Alternatively, a "state court decision unreasonably applies clearly established federal law if it 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'" *Id*. (quoting *Williams*, 529 U.S. at 407-08). In this context, "clearly established federal law" only "refers to the holdings, not dicta, of Supreme Court decisions at the time of the relevant state court decision." *Id*. (quoting *Williams*, 529 U.S. at 412). Regarding the second avenue for relief, the petitioner must prove not only that there was an unreasonable determination of the facts, but also that the state court relied on this unreasonable determination in reaching their conclusion. *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). If the petitioner fails to meet this standard by clear and convincing evidence, the state court's factual determinations are presumed to be correct. 28 U.S.C. § 2254(e)(1).

The requirements set forth by §2254 make clear that in reviewing state court judgments, federal courts owe great deference to that judgement, as "AEDPA deprives a federal court of authority to grant relief to a state prisoner on the basis that the federal court concludes, in its independent judgment, that a violation of federal law has occurred." *Rice*, 660 F.3d at 250.

### B.     Procedural Default and Excusing Default

A petitioner's application for a writ of habeas corpus cannot be granted unless one of the three following procedural conditions are met:

(1) "the applicant has exhausted the remedies available in the courts of the State";

(2) "there is an absence of available State corrective process"; or

(3) "circumstances exist that render such process ineffective to protect the rights of the applicant."

28 U.S.C. § 2254(b)(1)(A)-(B).

Thus, the petitioner must have presented the claims in his federal habeas petition to a state court under the same theory in which it is later presented in federal court prior to seeking habeas corpus relief on those issues. *Pillette v. Foltz*, 824 F. 2d 494, 497 (6th Cir. 1987). Although, petitioners are allowed mere variations in their legal *theory*, so long as they are not advancing a new legal *claim*. *Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir. 1987) (emphasis added). However, if petitioner "fails to fully and fairly present his claims to the state courts before the time for him to do so has expired, he procedurally defaults and is foreclosed from federal habeas review of those claims, absent a showing of cause and prejudice or a fundamental miscarriage of justice." *In re Cook*, 215 F.3d 606, 608 (6th Cir. 2000) (citing *O'Sullivan*, 526 U.S. 838 (1999); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 90-91 (1977)).

If a petitioner is relying on ineffective assistance of counsel to show cause and prejudice in order to excuse default, the petitioner must show that "some objective factor external to the defense impeded counsel's efforts" to follow the proper state procedures. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). In *Carrier*, the Supreme Court provided two possible, but not exhaustive, examples of these objective factors, including (1) that the factual or legal basis for a claim was not reasonably available to counsel, and (2) that interference by officials made compliance impracticable. *Id*. Mere attorney error cannot serve as the basis for excusing procedural default, so long as counsel met the constitutionally required minimum performance. *Id*. However, an attorney's "ineffectiveness in failing properly to preserve a claim for state-court review will suffice

as cause, but only if that ineffectiveness itself constitutes an independent constitutional claim." *Edwards v. Carpenter*, 529 U.S. 446, 447 (2000) (citing *Carrier*, 477 U.S. at 488-99). Additionally, "[t]o overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez v. Ryan*, 566 U.S. 1, 14 (2012).

## IV.     ANALYSIS

### A.     Ineffective Assistance of Counsel

Count II, ineffective assistance of counsel, will be addressed first since this claim also relates to Petitioner's basis for establishing cause and prejudice to excuse the procedural default of Counts I and III.

Petitioner argues that he was denied his Sixth Amendment right to counsel on the following four grounds: (1) trial counsel's failure to raise and/or appeal the problem of insufficient evidence, (2) trial counsel's failure to request a jury instruction on the requirement of accomplice corroboration, (3) trial counsel's failure to object to the victim's speculation, based on his "gut", that Petitioner was involved in the crime, and (4) trial counsel's failure to object to an in-court show-up identification of the Petitioner by the victim. Docket No. 1, pp. 3.

The Supreme Court has noted that, generally, to prove an ineffective assistance of counsel claim, a petitioner must show two things. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, a petitioner "must show that counsel's performance was deficient." *Id.* To establish deficiency, a lawyer must have "made errors so serious that counsel was not functioning as the 'counsel'" the Sixth Amendment guarantees. *Id.* This means "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 669. However, in examining deficient performance of counsel, the reviewing court must give difference to the attorney's performance

and "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* In fact, "[a] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* Second, a petitioner must show prejudice caused by the deficient performance. *Id.* at 687. This requires showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 669. This determination must be made by considering the totality of the evidence before the judge or jury." *Id.*

The standard set out in *Strickland* imposes an initial level of deference that is then bolstered by the deference imposed by 28 U.S.C. § 2254(d). *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Accordingly, federal courts are not to analyze whether counsel's actions were reasonable, but instead analyze "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* In other words, a federal court is meant to check that the state court acted reasonably in their decision that trial counsel's performance survived the *Strickland* analysis. *Id.*

Petitioner's ineffective assistance of trial counsel claims were raised to the state courts. *Merrilees v. State*, 2023 WL 3309562, at *8-15. Therefore, these claims are exhausted—not procedurally default—and will be assessed on their merits.

### 1. Failure to Challenge Insufficient Evidence

Petitioner argues that trial counsel rendered ineffective assistance by failing to file a post-judgment motion for acquittal citing the lack of accomplice corroboration or by failing to appeal insufficient evidence to the Court of Criminal Appeals. Docket No. 1, pp. 20. However, on post-conviction appeal, the Tennessee Court of Criminal Appeals found that while "trial counsel was deficient in failing to argue expressly the lack of accomplice corroboration in this case", Petitioner

was not prejudiced from this failure because the evidence overall was legally sufficient to corroborate the testimony of the accomplice from which Petitioner's identity as one of the perpetrators in this case could be inferred. *Merrilees v. State*, 2023 WL 3309562, at \*10-12. The Court stated that only slight circumstances are required to corroborate an accomplice testimony upon which a reasonable juror could infer that Petitioner was the third individual involved in the robbery, and the other evidence was legally sufficient to corroborate. *Id.* at \*12. This other evidence includes Petitioner being the only person besides the victim in the hotel restaurant/bar prior to the robbery, the victim's identification of Petitioner on the night of the incident as the restroom-goer, victim's identification of Petitioner as that same man at trial, and surveillance footage indicating that someone other than the two other accomplices in this case took the cash register from the restaurant/bar area. *Id.* The Court found that Petitioner could not establish that the outcome of the case would have been different had trial counsel moved for acquittal or appealed, so the Petitioner was not prejudiced from this failure. *Id.* Thus, relief based on this failure by trial counsel was denied.

In reviewing the conclusions of the Tennessee Court of Criminal Appeals, our role is not to determine whether the *Strickland* standard was satisfied, but whether the Court of Criminal Appeals' decisions were reasonable. *See Harrington*, 562 U.S. at 105. This Court finds that the Court of Criminal Appeals' conclusion of lack of prejudice is reasonable because the decision was not contrary to, or involved an unreasonable application of the *Strickland* standard. The Court of Criminal Appeals determined that, even putting aside the failure to raise the lack of accomplice corroboration, the other evidence on the record was legally sufficient for a reasonable juror to infer Petitioner was the third accomplice, and Petitioner could not otherwise show that the outcome of the case would have come out differently had an argument for lack of accomplice corroboration

been raised. *Merrilees v. State*, 2023 WL 3309562, at *12. Thus, the Court reasonably followed *Strickland*'s ruling that "an error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

### 2. Failure to Request Jury Instruction

Petitioner also argues that trial counsel rendered ineffective assistance by failing to request a jury instruction on accomplice corroboration. Docket No. 1, pp. 25. Similar to the failure to challenge accomplice corroboration issue above, the Tennessee Court of Criminal Appeals held that while an accomplice corroboration instruction should have been given to the jury, Petitioner failed to establish that this failure prejudiced the outcome of his case. *Merrilees v. State*, 2023 WL 3309562, at *12. As explained above, per the deferential *Strickland* standard, the Court was reasonable in holding that there was no prejudice because the evidence on the record was legally sufficient for a juror to determine Petitioner was an accomplice and the Petitioner could not show that an accomplice corroboration jury instruction would have changed the outcome of this case. *See Strickland*, 466 U.S. at 691.

### 3. Failure to Object to Victim's Speculation

Next, Petitioner argues that trial counsel rendered ineffective assistance by failing to object as speculation to the victim's testimony that Petitioner was involved in the robbery based on his "gut". Docket No. 1, pp. 3. The statement was made by the victim after he was asked whether he mentioned the Petitioner to the police after the robbery. *Merrilees v. State*, 2023 WL 3309562, at *3. The exact statement was the following: "I did off the top. I mean, he was the lookout. He was the lookout. And I knew it. It was my gut telling me. I knew certainly." *Id.* The Tennessee Court of Criminal Appeals concluded that, taken in context, this statement by the victim was not

impermissible speculation because it was based on the victim's rationally based perceptions of the events that took place that night. *Id.* at *13. This decision was not based on an unreasonable determination of the facts in light of the evidence presented because the Court analyzed all the facts on the record that made the victim's statement merely testimony that was "based on his rationally based perceptions." *See id.* ("Based on the late-night hour, the bathroom-goer's suspicious behavior, and the fact that the bathroom-goer entered the hotel shortly before the robbery occurred, it was logical for the victim to infer that the Petitioner was the lookout for the other two robbery perpetrators."). The Court also stated that even if this were improper speculation, "the record shows trial counsel made a strategic decision not to object to this testimony in an effort not to highlight it for the jury." *Id.* This determination by the Court is not contrary to, or involved an unreasonable application of, the *Strickland* standard because *Strickland* states that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690-91. Thus, the Court reasonably determined that trial counsel's decision not to object to speculation was not deficient performance.

### 4. Failure to Object to In-Court Show-Up Identification

Petitioner's final ineffective assistance of counsel claim is that trial counsel rendered ineffective assistance by failing to object to the victim's first time, in-court identification of Petitioner as an "illegal show-up." Docket No. 1, pp. 27. In concluding that Petitioner failed to establish deficient performance and prejudice as to this issue of an "illegal show-up," the Tennessee Court of Criminal Appeals discussed how there is no Tennessee case that squarely addresses a first time, in-court identification being improper, and the closest Supreme Court case,

*Perry v. New Hampshire*, does not support Petitioner's points. *Merrilees v. State*, 2023 WL 3309562, at *14. The Court states the following in discussing how *Perry* addresses eyewitness identification procedures:

> Moreover, the closest the United States Supreme Court has come to addressing this issue was in Perry v. New Hampshire, cited extensively in Martin, which held the safeguards generally available in criminal trials defeat due process objections to the admissibility of eyewitness identifications untainted by suggestive, police-arranged procedures. 565 U.S. 228, 232-33 (2012). Perry further acknowledged that "[m]ost eyewitness identifications involve some element of suggestion. Indeed, all in-court identifications do." Id. at 244. However, "[t]he fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." Id. at 245. In declining to "enlarge the domain of due process," the Court emphasized that "the jury, not the judge, traditionally determines the reliability of evidence." Id. Finally, the Court explained the Due Process Clause was employed to deter police misconduct, not supplant traditional trial safeguards.

*Id.*

Per the rulings in *Perry* and lack of Tennessee case law addressing first time, in-court identifications, the Court of Criminal Appeals found that trial counsel could not be said to have acted improperly in failing to object to this identification procedure because such an identification procedure is not clearly recognized as a due process violation. *Id.* This decision by the Court is not contrary to, or an unreasonable application of, the *Strickland* standard because the Court is reasonable in concluding that trial counsel's failure to object to a procedure not identified as impermissible under the controlling law is not deficient performance. *See Strickland*, 466 U.S. at 687. The Court also determined that a *Biggers* analysis to determine the likelihood of misidentification, which Petitioner particularly emphasizes, is not necessary in this case "because the victim's first time, in court identification did not involve any state action." *Merrilees v. State*, 2023 WL 3309562, at *15; see *Neil v. Biggers*, 409 U.S. 188, 199 (1972) ("The purpose of a strict rule barring evidence of unnecessarily suggestive confrontations would be to deter the police from

using a less reliable procedure where a more reliable one may be available, and would not be based on the assumption that in every instance the admission of evidence of such a confrontation offends due process."). The Court did not unreasonably apply federal law in concluding that there was no state action that led to the in-court showup for Petitioner because in *Perry* and *Biggers* the impermissible state action was directly from police interference. *See Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012); *Biggers*, 409 U.S. at 199. The Supreme Court specified in *Perry* that "due process concerns arise only when *law enforcement officers* use an identification procedure that is both suggestive and unnecessary." 565 U.S. at 238-39 (emphasis added). The Supreme Court emphasized that the purpose of its decision in *Perry* is to "deter police from rigging identification procedures." *Id*. at 233. Therefore, the Tennessee Court of Criminal Appeals reasonably determined that trial counsel's failure to object to the in-court identification, which did not include direct police involvement, was not deficient performance and was not contrary to established law.

## A.   Sufficiency of the Evidence

### 1.  Procedural Default

Petitioner did not raise a claim of insufficient evidence underlying his conviction, particularly regarding the State's failure to corroborate accomplice accusations, on direct appeal. Docket No. 1, pp. 3. Instead, he raised it for the first time on post-conviction review. Docket No. 11, ex. 16, pp. 43-44. Thus, the claim of insufficient evidence was waived and procedural defaulted, as acknowledged by petitioner, and as stated by the Tennessee Court of Criminals Appeal. Docket No. 1, pp. 3; *Merrilees v. State*, 2023 WL 3309562, at *8. Petitioner does argue, however, that he has good cause and prejudice to excuse the default due to his trial counsel's ineffective assistance by failing to raise or appeal the claim of insufficient evidence. Docket No. 1, pp. 4.

Petitioner's insufficient evidence claim and procedural default excuse based on ineffective assistance of trial counsel were raised on post-conviction proceedings. However, the "trial court determined that the Petitioner failed to establish by clear and convincing evidence that he received ineffective assistance of counsel" (Docket No. 11, ex. 16, pp. 43-44), and the Tennessee Court of Criminal Appeals on review added that "the petitioner was procedurally barred from raising the legal sufficiency claim based on lack of accomplice corroboration since he did not challenge it on direct appeal, and that petitioner was not able to establish for each of his ineffective assistance of counsel claims both that his lawyer's performance was deficient and that the deficient performance prejudiced the defense." *Merrilees v. State*, 2023 WL 3309562, at *6, 8.

This Court agrees with the decision of the Court of Criminal Appeals that the ineffective assistance of counsel claim does not establish sufficient cause and prejudice to excuse Petitioner's procedural default on his sufficiency of the evidence claims. As stated above, the Petitioner has not satisfied the deferential *Strickland* standard to show that his trial counsel's performance was legally deficient and that trial counsel's performance prejudiced the outcome of Petitioner's case such that the outcome in Petitioner's case would have come out differently. *See Strickland*, 466 U.S. at 687. Petitioner overall failed to "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim[s]" are substantial, or have some merit. *See Martinez*, 566 U.S. at 14. Since procedural default cannot be excused through ineffective assistance, Petitioner's insufficient evidence claim cannot proceed to the merits.

### 2. Merits

However, even if we proceeded to the merits of Petitioner's insufficient evidence claim, it still would fail because Petitioner is not able to show that corroboration of accomplice testimony in this case was legally insufficient. As discussed above, the state courts discussed how there was

other evidence that was legally sufficient to corroborate the accomplice testimony. The state Circuit Court specifically pointed out in its decision for denying post-conviction relief that Petitioner "is minimizing the video evidence that the jury considered." Docket No. 11, ex. 16, pp. 43-44. The video evidence helps corroborate the testimony given by the victim, which a rational juror could also reasonably find helps corroborate the accomplice testimony. The state Circuit Court was reasonable in determining that the facts presented at trial in this case provided legally sufficient evidence for the jury to convict Petitioner. *See id.* Therefore, this Court finds no merit to the insufficient evidence claim.

**B. Due Process Violation Based on an Unreliable and Suggestive In-Court Identification**

**1. Procedural Default**

Like the insufficient evidence claim, Petitioner argues that while the claim of unreliable and suggestive identification was waived and procedurally defaulted for failure to raise the claim on direct appeal, Petitioner can excuse this procedural default based on ineffective assistance because trial counsel gave ineffective assistance by waiving this claim. Docket No. 1, pp. 4. As discussed above, excuse based on ineffective assistance has not been sufficiently established by Petitioner because Petitioner has failed to show cause and prejudice. *See Martinez*, 566 U.S. at 14; *Strickland*, 466 U.S. at 687. Thus, Petitioner's due process claim cannot proceed to the merits since procedural default cannot be excused through ineffective assistance.

**2. Merits**

However, even if we analyzed the merits of Petitioner's due process claim, he still would not succeed, for the reasons already discussed regarding the permissibility of an in-court identification. Petitioner argues that the State violated his due process rights by convicting Petitioner based on an eyewitness identification procedure that was unnecessarily suggestive and

unreliable because the circumstances allowed for substantial likelihood of misidentification. Docket No. 1, pp. 42. Specifically, Petitioner alleges that the procedure was suggestive because it was an in-court identification where he was the only person in the courtroom on trial, he was the only person with facial tattoos, and the witness has already failed to identify Petitioner from an earlier lineup. *Id.* Additionally, the petitioner alleges that the procedure was unreliable because the witness saw the restroom-goer only briefly, the witness did not speak to the restroom-goer, the witness said the restroom-goer only had one tattoo under his eyes, the witness conceded that he was picking Petitioner based on his tattoos, and the length of time until identification was a year and a half. *Id.*

Petitioner is not able to establish that the procedure was suggestive through the presence of impermissible state action. Both *Biggers* and *Perry* indicate that the impermissible state conduct needed to make an identification procedure unlawful is law enforcement. *See Perry*, 565 U.S. at 233, 239-40 (citing *Biggers*, 409 U.S. at 199-200). Here, the in-court identification does not have any direct police involvement. Thus, "[w]hen no improper law enforcement activity is involved" other safeguards given to criminal defendants—such as "the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt"—are sufficient to protect the defendant's due process rights. *Perry*, 565 U.S. at 233. Additionally, the factors that Petitioner refers to in arguing the unreliability of the identification procedure were properly submitted for the jury to consider and weigh because additional pretrial screening would not have been done by the judge if trial counsel objected to this procedure due to the lack of direct police involvement. *See id.* at 232. In *Perry* the Supreme Court stated that "they have not extended pretrial screening for reliability to cases in which the suggestive circumstances

were not arranged by law enforcement officers," and that they would not do so despite "the grave risk that mistaken identification will yield a miscarriage of justice" because of other procedural safeguards that test reliability. *Id.* Therefore, this Court finds no merit to the due process claim based on suggestive in-court identification.

## V.    RECOMMENDATION

For the reasons discussed above, the undersigned recommends that habeas corpus relief be **DENIED.**

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute waiver of further appeal of this Recommendation. *See Thomas v. Arn.* 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**JEFFERY S. FRENSLEY**
**United States Magistrate Judge**